STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. HARRY W. SNOOK, PLAINTIFF IN ERROR.

Argued November 18, 1919—Decided March 8, 1920.

The judges being equally divided on the question whether the judgment should be reversed, the judgment is affirmed solely because of such division, which renders any opinion by the court impossible.

---

On error to the Supreme Court, whose opinion is reported in 93 *N. J. L.* 29.

For the plaintiff in error, *John H. Kafes* and *Aaron V. Dawes.*

For the defendant in error, *A. Dayton Oliphant,* prosecutor of the pleas.

PER CURIAM.

The judgment under review herein is affirmed by an equally divided court.

KALISCH, J.    The defendant was convicted in the Mercer Quarter Sessions for manslaughter.    The charge was predicated upon reckless driving by the defendant of an automobile whereby he ran down Albert Deardon, Jr., and Nellie Boss, causing their deaths.

Among the occupants of the car at the time of the fatality was Mimmick.    He was called as a witness for the defendant. On cross-examination he was asked by counsel of the state:

"*Q.* Do you know Henry Hartman?

"*A.* Yes, sir.

"*Q.* Did you see Mr. Hartman on the morning of July 4th last?

"*A.* I did.

"Mr. Kafes—I object to this.

"Mr. Oliphant—This witness made a statement to Mr. Hartman about the time of the accident, and it seems to me it is relevant and permissible.

"Mr. Kafes—Mr. Hartman is an attorney-at-law, and he went to see him in that capacity.

"The Court—You must find out if the relations were those of attorney and client."

The witness then testified that Hartman was the attorney of his mother and stepfather; that the witness called up Hartman on the telephone and went over to see him and told him what had taken place and was advised by the lawyer to go to the police station; that he did not retain Hartman as his

counsel, and that he asked Mr. Hartman how much he owed him, to which the reply was, "Nothing now."

The trial judge held that the relationship of counsel and client did not exist, and even if it existed Mimmick, the witness, only could claim the privilege. To this ruling counsel of defendant was allowed an exception.

Counsel of the state then was permitted to put to the witness questions framed on the statements alleged to have been made by the witness to Hartman, obviously, for the purpose of calling Hartman to contradict what the witness had testified to on his direct examination and cross-examination and for the purpose of introducing before the jury Hartman's version of what was told him by the witness.

The state called Hartman in rebuttal, and he was permitted, against objection of counsel, to testify to what Mimmick told him and to contradict Mimmick's version of what he said regarding the accident. Right here it is important to set out Hartman's statement as to what took place when Mimmick came for legal advice and direction. Hartman testified: "Mimmick came to my house and *said he was in very great trouble,* and he said *I don't know what to do,* and I said *speak* what your trouble is, and he said *you were* the *lawyer* of my *stepfather,* and I said yes, and he began to *tell me his story,* and I charged him no fee nor did I consider myself retained by him *because I told him he didn't need any attorney.* He did, however, offer to pay me for *my services,* and he said he had only two dollars with him and he would pay me later, and I said there is no charge," and further on he states: "I told him to go to the police station and tell a truthful story. I did advise him to that extent."

The legal question arising out of these facts was whether the relation of lawyer and client existed. I think it did. The Supreme Court seemed to think that the question was one of fact and some of the members of this court thought it was a pure question of fact and was not reviewable. Whether the relation of lawyer and client exists is a question of law. Sometimes it is a mixed question of law and fact. For ex-

ample, where there exists a controversy in the testimony as to the relation in which the parties stood to each other, it is solely within the province of the court to decide the question of fact, and its finding of fact becomes the basic ground for a further determination by the court as to the admissibility of the proffered testimony. The legal situation is akin to that which presents itself in the admission of dying declarations or alleged voluntary confessions in evidence. Here the testimony was not in dispute and clearly establishes that the communication made by Mimmick to Hartman was made to the latter for the purpose of obtaining his legal advice and direction, and, hence, it was error for the trial judge to decide that the relation of lawyer and client did not exist, and to permit Hartman to testify what Mimmick said to him on the occasion referred to.

Although Hartman testified that he was not retained by Mimmick, he frankly admits that the latter came to him to seek his legal advice and direction in the matter, and this circumstance, under all the well-considered cases on the subject, gives to the statement made by Mimmick to Hartman a confidential character, which could not be properly disclosed by the lawyer without the former's consent.

This legal rule is founded on public policy. It is unimportant, therefore, whether or not the defendant suffered harm upon the merits of the case, for the violation of the rule is in itself a sufficient ground to disturb the judgment. Unless this be so, it would leave the rule subject to be disregarded with impunity and lead to the subversion of the public policy which brought it into being.

*State* v. *Wilson,* 31 *N. J. L.* 77, is a clear exposition of the legal effect of the violation of a rule founded upon public policy by Chief Justice Beasley. See *State* v. *Herbert et al.,* 92 *Id.* 341 (at *p.* 350), following State *v.* Wilson.

In the present case, the violation of the rule was prejudicial to defendant. For it appears that Hartman gave testimony contradicting Mimmick, the effect of which was to shake

the credibility of Mimmick and weaken the testimony given by him favorable to the defendant.

In *Foster* v. *Hall,* 12 *Pick.* 89, Chief Justice Shaw said: "It is well established that the matter thus disclosed in professional confidence cannot be disclosed at any future time, nor can it begiven in evidence in another suit, although the *client* from whom the communication came *is no party* and has no interest in it." See *Rex* v. *Withers,* 2 *Camp.* 578. There are numerous cases to the same effect.

The contention that Mimmick was the only one who could take advantage of the confidential protection in a case where he was a party is not sustained by the authorities. If this were so the legal protection which the law gives to confidential communications between lawyer and client would in actual practice be no protection in fact. A strict adherence to this beneficent rule of public policy is absolutely necessary, in order to check an unscrupulous lawyer from availing himself of such an opportunity to divulge a client's most confidential business for ulterior reasons entirely personal to the attorney himself.

For the reasons stated I vote to reverse the judgment.

Mr. Justice Minturn and Judges Taylor, Gardner and Ackerson request me to state that they concur in these views.

WHITE, J. I agree with the views expressed by my brother, Kalisch. I think it a matter of public policy that citizens should *know* that they may safely consult in confidence officers of the courts duly accredited for that purpose to assist in the administration of justice. If under any circumstances without their consent clients' confidences may be required to be betrayed they cannot possibly have this knowledge. Accordingly, this court held, in *State* v. *Loponio,* 85 *N. J. L.* 357, as I understand it, that confidential communications from a client to his lawyer are at his (the client's) instance permanently protected from disclosure by himself, or, unless he waive the protection, by the lawyer or by the agent of either confidentially used to transmit the communication. If the

client himself is asked to testify he can do so or not as he sees fit. If he declines, the communication is protected "at his instance" from enforced disclosure by himself. But if the lawyer is called upon to so testify, the waiver of the protection *by the client,* whose protection it is, must be established. before *public policy* will permit the disclosure to be made. If it were otherwise no man could consult his lawyer frankly about his most sacred private affairs without risking their enforced public betrayal in some proceeding in which he had no interest, and of which he never heard, and, consequently, in which he never had opportunity to insist upon his protection. This is contrary to sound public policy, which, finding it necessary to fictitiously presume that every citizen has full and complete knowledge of the law, finds it equally necessary because of that fiction to practically supply citizens as far as possible with opportunity to procure whatever real legal knowledge their affairs may require in order to bring the reality up somewhere near the fiction.

But it is urged that even if the testimony should have been excluded because of a privileged communication, the only party aggrieved is the absent client whose confidential communication was disclosed without his consent, and as he has no interest in the case, there can be no appeal; that the defendant cannot complain because the testimony, as far as he is concerned, was just as relevant and unobjectionable without the client's waiver of his privilege as it would have been with that waiver. Wigmore (section 2196) takes this view, and while admitting that the contrary view prevails in a majority of the courts, he thinks this contrary view can only be upheld by an application of the Anglo-Norman instinct which he says looks upon litigation as a legalized sport wherein the game is to be won or lost accordingly as the arbitrary rules are observed or disregarded. I disagree with this assertion. The rule here involved is not arbitrary, but rests upon sound public policy. If the rule might be disregarded in cases where the client has no interest without defeating the very purpose which gave rise to its existence and upon which it rests, all

that Wigmore says of it would be true, but such is not the case. In order that the privilege may be *practically* preserved it is necessary that its violation shall be fatal to any cause or to any party in whose favor the violation occurs. The same public policy which necessitates the privilege necessitates its practical preservation. Public policy is not satisfied with theory; its fruits must be practically effective.

*For affirmance*—THE CHANCELLOR, PARKER, BERGEN, BLACK, HEPPENHEIMER, WILLIAMS, JJ. 6.

*For reversal*—MINTURN, KALISCH, WHITE, TAYLOR, GARDNER, ACKERSON, JJ. 6.